CHARLES F. NORWOOD *vs.* JOHN J. HOLDEN.

OLE OPEN *vs.* JACOB PAULSON.

February 2, 1891.

County-Commissioner Districts — Redistricting after U. S. Census.— Under Gen. St. 1878, c. 8, § 93, the board of county commissioners, after a United States census of the population of their county has been taken, may, upon ascertaining the result to their own satisfaction from any source of information, proceed to redistrict their county, without any formal or official announcement or certification of the enumeration by the census bureau.

Same—Redistricting Wholly Prospective — Persons Already Elected not Affected.—Such redistricting is merely prospective in its operation as to elections of members of the board of county commissioners. Hence, where a person was duly elected at the general election in November for a term to commence the following January, he would not become disqualified, or be deprived of his right to the office, by reason of the fact that, in a redistricting made in December, the town in which he resided was included in a district differently numbered from that for which he was elected.

Applications for leave to file informations in *quo warranto*.
*Wilson & Bowers,* for petitioners.
*H. C. Grass* and *B. H. Whitney,* for respondents.

MITCHELL, J. These are applications for leave to file informations in the nature of *quo warranto*. The petitions of the relators, and the returns of the respondents to the orders to show cause, fully set out the facts, as to which there is no dispute. Counsel argued the matters fully on the merits, and expressed a desire that the court would, in passing upon these applications, express its opinion upon the legal points involved, as it might be decisive of the controversy between the parties, which is as to their respective rights to the office of county commissioner of Murray county. This county has for some years polled over 800 votes, and has had a board of county commissioners, consisting of five members, it being divided into five commissioner districts, as provided by law. Among the members composing this board during the year 1890 were the respondents, Holden and Paulson, for the second and fourth districts, respectively, and whose terms of office expired the first Monday in January, 1891. At the general election held in November, 1890, the relators, Norwood and Open, were duly elected members of the board to succeed the respondents, —Norwood for the second district, and Open for the fourth,—and both received certificates of election. Each was at the time of his election a resident of the district for which he was elected, and neither of them has since changed his place of residence. At a meeting held on the 17th day of December, 1890, the board of county commissioners redistricted the county by changing the boundaries of the several districts, basing their action upon a statement of the population of the several towns according to the United States census of 1890, as communicated to them by letter dated December 5th, from the special agent in charge of the fourth division of the census bureau, which, as he stated, was made rather hurriedly and out of the ordinary routine, and for the accuracy of which in small details the office would not vouch, although he thought it would stand future and final scrutiny. The result of this redistricting was that the relators, who were elected for the second and fourth districts, were put in the third and fifth districts; the towns in which they resided being attached to those districts. On the first Monday of January, 1891, each of the relators duly qualified, and, at a meeting of the board on the first Tuesday of the same month, appeared and de-

manded his seat as a member of the board. The board, however, declined to recognize their claim, and the respondents retained their seats, claiming that as relators had, by reason of the redistricting, ceased to be residents of the districts for which they were elected, they were disqualified, and that therefore they (the respondents) were entitled to hold over until their successors were elected or appointed and qualified. Subsequently the chairmen of the boards of supervisors of the several towns composing the second and fourth commissioner districts, as constituted under the redistricting, met, and, upon the assumption that there were, by reason of the foregoing facts, vacancies in the offices of commissioners for those districts, appointed the respondents to succeed themselves; and under these appointments they now claim to hold the office of commissioner for the second and fourth districts, respectively.

Upon these facts, two legal questions arise, viz.: (1) Was the action of the county board in redistricting the county legal? (2) If so, did it deprive the relators of the right to the office of county commissioner, to which they were, respectively, duly elected in November? This involves the construction to be placed upon Gen. St. 1878, *c.* 8, §§ 93, 94, which, so far as here material, are as follows:

"Sec. 93. * * * The board of commissioners may redistrict their counties, respectively, after each United States or state census, taking the population as shown by their said census as the basis.

"Sec. 94. In each of said districts one commissioner shall be elected by the electors thereof, who shall *at the time of his election* be a resident of said district, and shall reside *therein* during his continuance in office."

1. The relators claim that the board of county commissioners had no jurisdiction to redistrict the county on December 17th, for the reason that the United States census had not then been completed, or officially ascertained or announced. We think there is nothing in this point. The enumeration of the population of the county had, as we must assume, been in fact completed, although the computation of the results may not have been definitely and finally made by the census bureau. We find no provision in the laws of the United States providing for any official announcement of the results of the

census, or anything in the statutes of this state providing for or requiring any formal or official certification of these results to the board of commissioners. In our opinion, the board may seek for and obtain information as to the result of the enumeration of the population of their county according to the census in any way and from any source they please; and, whenever and however they may have acquired the information to their own satisfaction, they may act on it in redistricting the county, without waiting for any particular tabulations or computations by the officers of the census bureau. So far as appears from either the petitions of the relators or the answers of the respondents, we are of opinion that the order of the county board redistricting the county was valid.

2. In our opinion, an order redistricting a county is merely prospective in its operation as to the election and qualification of members of the board of commissioners, and in no way affects the right to the office of those previously elected. There is nothing in the language of the statute to indicate that a redistricting is intended to have any retrospective operation. On the contrary, the language of section 94 favors the opposite view. The commissioner, it says, "shall, *at the time of his election,* be a resident of said district, and shall reside *therein* during his continuance in office." What this last clause has reference to is an actual change of residence, and not a change of district boundaries. The division of a county into districts is merely for election purposes. The duties of commissioners are not local, or to be performed in only a particular part of the county. On the contrary, they are merely members of an entire board, which acts as such for the entire county. Any other construction would lead to the gravest abuses, and often entirely defeat the popular will as expressed at the polls. It certainly could not have been the intention of the legislature to permit a board of county commissioners, by redistricting after the election of their successors, but before their terms of office begin, to continue themselves in office, and exclude those whom the people have chosen. Yet this is what the contention of respondents, if correct, would lead to. The consequences are forcibly illustrated by the facts of this case. While the board may have been actuated by the most disinterested motives, yet it is a remarka-

ble coincidence that under the new districting all five of the old members were left residents of the same numbered districts as before, while both of the members elect were thrown into differently numbered districts from those for which they were elected. It seems that it was assumed that if relators had, by reason of the redistricting, become disqualified from taking their seats on the board in January, this created vacancies which the chairmen of the boards of town supervisors were authorized to fill. But this was a mistake, for it would not be one of the events the happening of which would create a vacancy, under the provisions of Gen. St. 1878, *c.* 9, § 2. If relators became disqualified, then respondents would, by law, hold over until their successors were elected at the next general election, and qualified. The practical result, then, of respondents' construction of the law is that it is in the power of a majority of the board of commissioners, by gerrymandering the county, to legislate out of office any two of their own number, or to keep out of office those who have been elected their successors, and hold on to the offices themselves for two years longer than the terms for which they were elected. There is nothing in the language of the statute which compels a construction leading to consequences so dangerous and unjust.

The relators ask in their petitions that the respondents may be restrained, pending these proceedings, from acting as county commissioners upon certain matters now before the board. It would be against all precedent, as well as the plainest considerations of public policy, to grant any such restraining order in a proceeding to try the title to an office. No such order can be granted. What liability, criminally or otherwise, the respondents would incur, if, after authoritative information that they have no right to the office, they should wilfully continue to exercise its functions, we need not now consider, as no such contingency is to be anticipated.

Leave to file the informations as prayed for is granted.